**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

ST. JOSEPH HOSPITAL,                    *
AUGUSTA, GEORGIA, INC.;                  *
ST. JOSEPH VENTURES, INC.;               *
ST JOSEPH M.O.B., L.P.,                  *
a Georgia Limited                        *
Partnership; and ASCENSION               *
HEALTH,                                  *
                                         *
        Plaintiffs,                     *
                                         *
       v.                              *          CV 107-104
                                         *
HEALTH MANAGEMENT                        *
ASSOCIATES, INC.,                        *
                                         *
       Defendant.                      *

---

**O R D E R**

---

Presently before the Court are Defendant's motion for summary judgment (doc. no. 101) and Plaintiffs' motion for partial summary judgment (doc. no. 106). The Clerk gave the parties appropriate notice of the summary judgment motions and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. nos. 104 & 109.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are now ripe for consideration.

# I. BACKGROUND

## A. The Hospital and the Solicitation of Bids to Purchase

Until November 2006, Plaintiffs St. Joseph Hospital, Augusta, Georgia, Inc., St. Joseph Ventures, Inc., and St. Joseph M.O.B., L.P. (collectively "St. Joseph") owned and operated a non-profit institution ("St. Joseph Hospital" or "the Hospital") that provided, among other services, general acute care in Augusta, Georgia. (Doc. no. 108, Ex. 11 at 33.) Several years prior to this date, the Hospital began experiencing economic and operational problems. (Id., Ex. 3 at 8; Owings Dep. at 24.) Consequently, in 2005, St. Joseph's parent company, Plaintiff Ascension Health ("Ascension"), engaged an advisory firm to solicit bids to purchase the Hospital's assets. (Doc. no. 108, Ex. 3 at 9.) Eighteen companies expressed interest, and ten companies submitted formal bids. (Id.)

The highest bidder was Defendant Health Management Associates, Inc. ("HMA" or "Defendant"), offering to pay Ascension $87 million. (Id., Ex. 12 at 1.) The three closest offers, from highest to lowest, were as follows: $60 million, $50 million, and $37 million. (Doc. no. 103, Ex. 26.) Ultimately, Ascension chose to negotiate with HMA regarding the sale of the Hospital. (Id., Ex. 14 at 10-12.) The parties signed a confidentiality agreement on July 14, 2005. This agreement prohibits public comments regarding the terms of any future transaction and further prohibits "any actual or implicit disparagement or denigration" of Plaintiffs. It also

granted HMA access to Plaintiffs' financial information for the purpose of conducting its due diligence. (Doc. no. 108, Ex. 3 at 27; Doc. no. 103, Ex. 15.) With the assistance of counsel on both sides, the parties began a tedious negotiation process. (Bell Dep. at 34-36.) As a result of this process, by December 21, 2005, HMA's offer had been reduced to approximately $75 million. (Doc. no. 108, Ex. 15 at 18, 20.)

### B. Submission to Georgia's Attorney General

Georgia's Hospital Acquisition Act, O.C.G.A. § 31-7-400 *et seq.*, applies to transactions in which a non-profit hospital is selling its assets to a for-profit entity. Under the Act, parties must provide the Attorney General with at least 90 days notice of a proposed transaction prior to its consummation. O.C.G.A. § 31-7-401. Within 60 days of receiving notice, the Attorney General is required to hold a public hearing to ensure that the terms of the transaction protect the public's interests. O.C.G.A. § 31-7-405.

In accordance with the Act, on December 22, 2005, the parties submitted their Notice to Attorney General of Intent to Acquire or Dispose of Assets of a Hospital ("AG Notice").[1] (Doc. no. 108, Ex. 3 at 1.) They attached an unsigned Asset Sales Agreement ("ASA") as an exhibit to the AG Notice.[2] (Doc. no. 103, Ex. 14 at 5.) The

---

[1] The AG Notice was the product of joint efforts by the parties, but HMA did not sign the filing. (Doc. no. 103, Ex. 14 at 22.)

[2] Notably, the Attorney General issued an announcement in April of 2000 clarifying its procedure for reviewing the acquisition or disposal of a hospital under the Act. The announcement states in part that: "No party shall be contractually bound to consummate the proposed transaction on the date of the Notice to the Attorney

AG Notice explains that "[t]he Acquisition Agreement is designed as an Asset Sale Agreement by and among [St. Joseph] as Seller, and [HMA] as Purchaser. The Asset Sale Agreement provides for the purchase and sale of the Hospital by means of an asset purchase transaction."[3] (Id. at 3.) As described by the AG Notice, the attached ASA was "substantially" completed, but was unexecuted and did not contain the final schedules and exhibits. (Doc. 103, Ex. 14 at 12-13.) The Attorney General scheduled a public hearing to review the transaction for Monday, February 13, 2006, in Augusta, Georgia. (Hilton Dep. at 18.)

### C. Conduct Following Submission to the Attorney General

After submission of the AG Notice, in a December 27, 2005 press release, HMA stated that it had "negotiated an agreement to acquire St. Joseph" and "[t]he execution and closing of the purchase agreement [were] subject to the review and approval of the Georgia Attorney General's Office."[4] (Doc. no. 108, Ex. 3 at 29.) Two days later, HMA reiterated this in a Form 10-K filed with the United States Securities and Exchange Commission (SEC).[5] HMA declared that it had "announced the negotiation of an agreement to

---

General. Therefore, the proposed acquisition agreement which is submitted to the Attorney General shall not be executed by the parties." (Doc. no. 108, Ex. 12 at 6.)

[3] In addition to assets, licenses, rights, and goodwill, the ASA contemplates a transaction involving the sale of real property. (Doc. no. 103, Ex. 13 at 9.)

[4] HMA's January 24, 2006 press release likewise stated that "[o]n December 27, 2005, HMA negotiated an agreement to acquire [St. Joseph]" and that "execution and closing of the purchase agreement are subject to review and approval of the Georgia Attorney General's office." (Doc. no. 108, Ex. 6 at 10.)

[5] A Form 10-K is an annual report filed with the SEC to give a comprehensive overview of the company's performance.

acquire St. Joseph Hospital," and "[p]ursuant to applicable state law, the execution of a definitive purchase agreement and closing of the transaction [were] subject to review and approval by the Georgia Attorney General's office."[6] (Doc. no. 108, Ex. 4 at 4.) On January 3, 2006, HMA issued another press release providing that it had "signed or finalized negotiations on definitive agreements regarding four acquisition opportunities." (Doc. no. 108, Ex. 6 at 1.) HMA further stated that, "upon completion of the previously announced transactions to acquire the 231-bed St. Joseph Hospital, . . . HMA will operate 61 hospitals in 16 states with 8,912 licensed beds."[7] (Id.) In addition to issuing press releases, HMA began transitional activities in preparation for the proposed acquisition, which included, applying to change over certain licenses, installing HMA's computer systems, and training the Hospital's employees on HMA protocol. (Doc. no. 108, Ex. 8 at 17; Doc. no. 108, Ex. 10 at 2; Owings Dep. at 44-45; Whitman Dep. at 67; Cherry Dep. at 65.) HMA representatives attended meetings with St. Joseph Hospital's staff and requested that the Hospital maintain the status quo. (Comeau Dep. at 91; Kreager Dep. at 89-90.)

---

[6] On February 9, 2006—two days before the scheduled Attorney General hearing—HMA filed a Form 10-Q, a quarterly report, with the SEC that included a similar statement. (Doc. no. 108, Ex. 6 at 26.)

[7] HMA's January 13, 2006 press release included a similar statement. (Doc. no. 108, Ex. 6 at 4.)

## D. The Letter of Intent

On January 25, 2006, the parties executed a letter of intent ("LOI") that was submitted in conjunction with their Premerger Notification and Report to the Department of Justice and the Federal Trade Commission.[8]   (Doc. no. 108, Ex. 16.)   Under the heading "Description of Acquisition," the filing states that pursuant to the LOI, Defendant intends to acquire St. Joseph Hospital and that the transaction is conditioned upon, among other things, the execution of a definitive agreement. (Id. at 6.) The LOI is one of the only documents signed by HMA, St. Joseph, and Ascension.   Its stated purpose is to "set forth the mutual understanding" and "present intentions" of the parties with respect to the sale of the Hospital. (Id., Ex. 12 at 7, 9.)

The LOI provides that it "reflects the parties' intention to finalize and execute a binding Asset Purchase Agreement" and expressly acknowledges that specific changes may occur prior to the ASA's final execution.   (Id.)   According to the LOI, "the definitive Asset Sale Agreement, at such time as it is fully executed by Seller and Purchaser, will supersede [the] Letter of Intent, and thereafter, [the] Letter of Intent will be of no further force or effect." (Id.)

The parties explicitly state in the LOI that it is "intended as an expression of mutual intent only and does not constitute an

[8] As the proposed acquisition was for more than $50 million, the parties were required to submit the proposal for approval under the antitrust scrutiny of the Hart-Scott-Rodino Act. (Bell Dep. at 91); 15 U.S.C. § 18a. The parties determined that it was necessary to submit some form of written agreement; given that they had not executed the ASA, the parties agreed to draft and execute the LOI. (Doc. no. 108, Ex. 17 at 3.)

obligation binding in any way on the parties," except for the provisions of the third, fourth, and fifth paragraphs. (Id. at 8-9.) The third paragraph contains an exclusivity clause providing that until the earlier of the execution of the ASA or March 31, 2006, Plaintiffs could not negotiate with or solicit offers from parties other than HMA with respect to the sale of the Hospital; the fourth paragraph states that the parties were still bound by the aforementioned Confidentiality Agreement, with the exception of necessary filings or notifications; and the fifth paragraph provides for the allocation of fees and expenses related to the proposed transaction "in the event that a definitive Asset Sales Agreement is not executed." (Id. at 7-8.)

### E. HMA's Withdrawal from the Proposed Transaction

On Friday, February 10, 2006, HMA's newly hired President and Chief Operating Officer visited the Hospital for the first time. (Whitman Dep. at 139, 141.) Based upon this visit and an early February 2006 financial analysis, he concluded that St. Joseph Hospital's financial condition was rapidly deteriorating. (Id. at 108-12, 120-21.) Upon returning to HMA's headquarters in Florida, he held a meeting at which he recommended that HMA withdraw from the proposed transaction. (Doc. no. 108, Ex. 8 at 1.) The recommendation was affirmed and, that afternoon, Ascension's CFO was informed of the decision. (Parry Dep. at 187; Bell Dep. at 131.) That Monday, February 13, 2006, the day of the scheduled

Attorney General hearing, HMA sent a follow-up letter confirming that it was "withdrawing its non-binding offer to acquire St. Joseph's Hospital from Ascension." (Doc. no. 108, Ex. 7 at 4.) HMA likewise informed the Attorney General's office that it was "withdrawing its non-binding offer to acquire St. Joseph Hospital and other related assets" because "the hospital has experienced significant deterioration in its operating performance including adverse changes in physician referral practices since the submission of the [AG Notice]."[9] (Id., Ex. 8 at 4.)

The Attorney General's Office acknowledged that the proposed transaction would not proceed, cancelled the hearing, issued no report, and closed the public record in the matter. (Doc. no. 103, Ex. 24 at 1; Ex. 41 at 1; Parry Dep. at 193, 238.) St. Joseph and Ascension began the bidding and negotiation process anew and ultimately sold the Hospital to a third party on November 1, 2006, for approximately $37 million. (Speranzo Dep. at 92.)

### F. Procedural Posture

Plaintiffs filed the current lawsuit in the Superior Court of Richmond County on June 8, 2007, and Defendant removed the case to this Court on July 17, 2007. (Doc. no. 1.) In their Complaint, Plaintiffs allege that Defendant breached a contract to purchase St. Joseph Hospital or, in the alternative, that Plaintiffs are entitled to recover under a theory of promissory estoppel. (Compl. ¶¶ 19-23, 35-41.) Plaintiffs further contend that Defendant

---

[9] It is undisputed that this correspondence was subject to Georgia's open records laws. (Doc. no. 113 ¶ 75.)

breached a duty to act in good faith and cooperate in connection with the transaction, Defendant breached the parties' confidentiality agreement, and Plaintiffs are entitled to attorneys' fees. (Id. ¶¶ 24-28, 29-34, 42-45.)

On July 13, 2010, Defendant filed a motion for summary judgment, asserting that each of Plaintiffs' claims fail as a matter of law. (Doc. no. 103.) That same day, Plaintiffs moved for partial summary judgment, arguing that the parties formed a valid and enforceable agreement for the purchase of the Hospital; Defendant breached that agreement; and the statute of frauds does not bar the Court from enforcing the agreement. (Doc. no. 108.)

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant

10

presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

## III. DISCUSSION

### A. Breach of Contract

#### 1. *Applicable Law*

To recover in a breach of contract action, a plaintiff must show breach of a contract and damages. Budget Rent-a-Car of Atlanta v. Webb, 220 Ga. App. 278, 279 (1996). The party relying on the contract has the burden of proving the existence and terms of the contract by a preponderance of the evidence.[10] Schilling v.

---

[10] Defendant argues that, under Georgia law, "the party asserting the existence of a contract has the burden of proving its existence and terms by clear and convincing evidence" rather than by a preponderance. (See Doc. no. 103 at 11.) As pointed out by Plaintiffs, each case Defendant cites for this proposition analyzes an alleged breach of an *oral* contract. See, e.g., Hudson v. Venture Indus., Inc., 243

11

Cornerstone Med. Assoc., LLC, 290 Ga. App. 169, 170 (2008). Specifically, a plaintiff has the burden of proving "a subject matter, a consideration, and mutual assent by all parties to all terms." Lamb v. Decatur Fed. Sav. & Loan Ass'n, 201 Ga. App. 583, 585 (1991) (citing O.C.G.A. § 13-3-1); see also Assoc. Muts., Inc. v. Pope Lumber Co., 200 Ga. 487, 491 (1946) ("To carry this burden, it was necessary for the plaintiff to show, by a preponderance of evidence, every necessary essential of a valid contract . . . .").

The critical element in this case is mutual assent. A valid agreement can only be formed when "the minds of the parties meet at the same time, upon the same subject-matter, and in the same sense." Cox Broad. Corp. v. Nat'l Coll. Athletic Ass'n, 250 Ga. 391, 395 (1982). To determine whether there has been a meeting of the minds:

> [C]ourts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestation of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent.

Id.

Related to the issue of assent is the question of intent. In order to determine whether a contract exists, courts must consider whether the parties intended to be bound by the terms of the

Ga. 116 (1979); Ga. Farm Bureau Mut. Ins. Co. v. Croley, 263 Ga. App. 659 (2003); Mooney v. Mooney, 245 Ga. App. 780 (2001). At the same time, Plaintiffs provide authority supporting their assertion that in a typical breach of contract case involving a written contract, the burden of proof is a preponderance of the evidence. See Wallace v. Triad Sys. Fin. Corp., 212 Ga. App. 665, 666 (1994) ("It would be [plaintiff's] burden at trial to prove by a preponderance of the evidence the existence and terms of the contract on which it relies for recovery.") The Court agrees with Plaintiffs' position.

agreement. <u>Doll v. Grand Union Co.</u>, 925 F.2d 1363, 1367 (11th Cir. 1991) (applying Georgia law) (explaining that primary question for court was whether parties intended to create a legally binding obligation); <u>Turner Broad. Sys., Inc. v. McDavid</u>, 303 Ga. App. 593, 598 (2010) (identifying the parties' contentions related to element of assent before analyzing "[t]he parties' objective manifestations of their mutual assent and intent to be bound to the [] acquisition deal"); <u>Quadron Software Int'l Corp. v. Plotseneder</u>, 256 Ga. App. 284, 287 (2002); <u>Pacrim Assocs. v. Turner Home Entm't</u>, 235 Ga. App. 761, 764 (1998). Georgia law is clear that "agreements to agree or preliminary statements of intent to contract in the future are unenforceable." <u>Doll</u>, 925 F.2d at 1367; <u>Malone Constr. Co. v. Westbrook</u>, 127 Ga. App. 709, 709 (1972) ("[A] contract to enter into a contract in the future is of no effect.") Critically, the Court must look to whether the parties intended and assented to a final, binding contract to consummate the transaction or if they merely had an unenforceable "agreement to agree in the future." <u>See Hartrampf v. Citizens & S. Realty. Inv.</u>, 157 Ga. App. 879, 881 (1981).

### 2. *Analysis*

According to Plaintiffs, "HMA breached its agreement to purchase St. Joseph Hospital" and Plaintiffs have "been damaged as a direct and proximate result of HMA's breach of its agreement to purchase." (Compl. ¶¶ 20-23.) Defendant argues that it is entitled to summary judgment on this claim because, among other

13

things,[11] no binding contract ever arose from the parties' negotiations. Plaintiffs maintain that the parties entered into a binding contract to consummate the transaction and that Defendant was bound, on or before December 22, 2005, when the ASA was submitted to the Attorney General's office for approval. Plaintiffs posit that by the time Defendant withdrew from the transaction in February of 2006, the parties had a binding, but unconsummated, contract for the sale of the Hospital.

Plaintiffs rely almost exclusively on Defendant's ambiguous public statements and actions in their attempt to show an intent to be bound, and they largely brush aside the fact that there is no evidence of a signed contract and no evidence that Defendant made any written or oral representation to Plaintiffs demonstrating an intent to be bound or a belief that a binding contract existed. It is undisputed that the parties did not sign any version of the ASA,[12] and Plaintiffs are unable to point to a single statement made by Defendant during negotiations communicating Defendant's intent to be bound by the unsigned ASA.

Plaintiffs also brush aside the clearest evidence of intent in the record, the LOI, which explicitly sets forth the parties' "mutual understanding" and "intentions." (Doc. no. 108, Ex. 12 at

---

[11] Defendant additionally argues that Plaintiffs' breach of contract claim fails as a matter of law because under the Georgia Hospital Acquisition Act there could be no binding, enforceable agreement without prior approval of the Georgia Attorney General. Defendant also contends that this claim fails because there is no signed writing that could satisfy the statute of frauds. (Doc. no. 102 at 20.)

[12] The Court notes that the ASA allocates space for the signature of Defendant, as purchaser, and the signatures of Plaintiffs, as sellers, to indicate that "this agreement has been entered into." (Doc. no. 108, Ex. 2 at 67.) The document, however, was never so executed.

7.) Simply put, Plaintiffs cannot overcome the express language in the LOI, which conclusively establishes that no binding agreement existed as of January 25, 2006, the date the parties executed the LOI.

It is apparent from the LOI's opening paragraph that the parties did not consider themselves bound by any version of the ASA. The first substantive paragraph of the LOI reads:

> This Letter of Intent reflects the parties' intention to finalize and execute a *binding* Asset Sale Agreement in the current form attached to this Letter of Intent . . . with those changes (a) which are required by the Attorney General of the State of Georgia . . . (b) which otherwise result from the process set forth in the Georgia Hospital Acquisition Act . . . or (c) which are otherwise agreed upon by Seller and Purchaser . . . .

(Id. (emphasis added).) According to the text, the parties' "mutual understanding" regarding the transaction, as of January 25, 2006, was that they had only an "intention to finalize and execute a binding Asset Sale Agreement." (Id.) This stands in direct conflict with Plaintiffs' position that the parties mutually understood that a binding contract had already been formed.

The LOI further provides that "[t]he definitive Asset Sale Agreement, at such time as it is fully executed by Seller and Purchaser, will supersede this Letter of Intent and, thereafter, this Letter of Intent will be of no further force or effect." (Id.) This forward-looking expression of intent demonstrates two things. First, the parties clearly intended to enter into a binding agreement in the *future*. Second, the parties' stated desire for the ASA to "supersede" the LOI once "fully executed"

15

makes clear that the LOI—not the ASA—was the controlling agreement as of January 25, 2006.[13]

Plaintiffs import a different meaning to the above-cited language and contend that the LOI was meant to "recognize[] an already existing agreement," "serve[] to further confirm the fact of agreement and the parties' mutual intention to consummate the ASA after the public hearing," and "affirm the existence of the agreement." (Doc. no. 116 at 40; Doc. no. 108 at 41 & 45.) The Court is confident that if these sophisticated parties represented by experienced legal counsel intended to be bound by the attached ASA, the LOI would have reflected this fact. The LOI's unambiguous text, however, makes absolutely no mention of any pre-existing binding contract or of an intent to consummate a previously formed contract.

Even if it put aside what is absent from the LOI, the Court would reach the same conclusion. Notably, the third paragraph of the LOI contains an exclusivity clause that reads as follows:

> From the date of this Letter of Intent through the earlier of (a) the execution of the Asset Sale Agreement and (b) March 31, 2006, Seller shall not . . . without the prior written consent of Purchaser: (i) offer for sale or lease the assets of the Hospital or the Assets .

---

[13] The Hart-Scott-Rodino filing provides further evidence that the LOI was the controlling agreement. Defendant stated that it intended to acquire St. Joseph Hospital "pursuant to the Letter of Intent," and the transaction was conditioned upon, among other things, the execution of a definitive agreement. (Doc. no. 108, Ex. 16 at 6.)

Notably, the LOI—the controlling agreement—did not create a binding obligation for the sale of the Hospital. The LOI itself contains a statement that it "is intended as an expression of mutual intent only and does not constitute an obligation binding in any way on the parties, except for the provisions of the third, fourth and fifth paragraphs hereof." Similarly, the LOI was sent to the Attorney General on January 31, 2006, with a transmittal letter from Plaintiffs' counsel explaining that it was "nonbinding as to the sale of assets." (Doc. no. 103, Ex. 39 at 1.)

. . . whether by merger, consolidation, purchase of assets, joint venture, exchange or otherwise; (ii) solicit, negotiate, initiate or encourage to take other action to facilitate . . . offers to buy all or any material portion of the Hospital or the Assets; (iii) hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of the Hospital or Assets. . . .

(Doc. no. 108, Ex. 12 at 7-8.) In other words, during the designated exclusivity period, Plaintiffs could negotiate only with Defendant for the sale of the Hospital.[14]

Exclusivity clauses are common in preliminary letters of intent and generally demonstrate that the parties do not intend to be bound. See Evergreen Inv., LLC v. FCL Graphics, Inc., 334 F.3d 750, 755 (8th Cir. 2003) ("The final paragraph of the August 30 letter also demonstrates the parties' intent not to be bound . . . . To facilitate subsequent negotiations, FCL agreed to a '90-day exclusivity period to consummate the proposed transaction.' There would seem little need for an exclusivity period . . . if the parties intended to be bound to a sale at the time the letter was signed."). The present situation, however, is somewhat unique in that the language of the LOI's exclusivity clause is nearly identical to a "No-Shop" provision in Article 4.6 of the unexecuted ASA.[15] (Doc. no. 108, Ex. 2 at 31.) The Court finds that the

---

[14] Defendant initially proposed that the exclusivity period extend through April 30, 2006; however, Plaintiffs' counsel transmitted a redlined draft of the LOI back to Defendant in which he explained that Plaintiffs would be "willing to agree to an exclusive through March 31, 2006, as long as the parties formally document [their] respective responsibilities for transaction costs in a manner consistent with the terms of the draft Asset Sale Agreement." (Doc. no. 103, Ex. 33 at 1.)

[15] It is noteworthy that neither parties' briefs cite Article 4.6 of the ASA or provide argument with respect to the presence of the nearly identical provision.

similar clauses in the two documents provide evidence that the unexecuted ASA was not a binding contract. If the parties were, as Plaintiffs allege, already bound by the terms of the ASA at the signing of the LOI, this would mean that Plaintiffs had already agreed, pursuant to Article 4.6, to negotiate exclusively with Defendant "until the earlier of the Closing Date or the termination of [the ASA]" (id.); thus, there would have been no reason for the parties to negotiate a period for exclusive negotiations or repeat the provision in the LOI. The inclusion of this clause, combined with the evidence that the duration of the exclusivity period was shortened at the insistence of Plaintiffs' counsel, shows that, as of January 25, 2006, the parties understood that Defendant was not bound to purchase the hospital.[16]

The non-binding nature of the transaction at issue is further evidenced by the allocation of costs provision within the LOI. In its fifth paragraph, the LOI contains the following language:[17]

> In the event a definitive Asset Sale Agreement is not executed, each of Seller and Purchaser will bear its own legal, accounting and other fees and expenses related to the proposed transaction, subject to the following: (a) Purchaser shall bear (i) all costs of the Surveys and (ii) all costs of the environmental surveys contained in draft schedule 2.6(b) of the Asset Sale Agreement; (b)

---

[16] Plaintiffs are unable to articulate, in light of their position that a binding contract had already been formed, the reason any such exclusivity provision would have been included. Ascension's CFO and chief negotiator testified that he does not have any recollection of discussions with HMA regarding the exclusivity clause or why Ascension's counsel might have proposed shortening the period. (Speranzo Dep. at 119-20.) Likewise, Ascension's General Counsel testified that the "paragraph speaks for itself" and did not offer any additional explanation. (Impicciche Dep. at 115-16.) Plaintiffs simply dismiss this argument in their briefs and state that "this language addresses issues relating to approval and closing—it is not probative on whether the parties formed a final agreement." (Doc. no. 116 at 42-43.)

[17] The email exchange between the parties' counsel and redlined drafts of the LOI indicate that this clause was inserted upon the insistence of Plaintiffs' counsel. (Doc. no. 103, Ex. 33 at 13.)

each of Purchaser, on the one hand, and Seller, on the other hand, shall bear one-half of (i) all fees payable to the Georgia AG as required pursuant to the Georgia Hospital Acquisition Act and (ii) all costs of the Title Commitment; (c) all fees and expenses of Seller incurred in connection with Seller's filing under the HSR Act shall be borne by Seller; and (d) all filing fees imposed in connection with Purchaser's filings under the HSR Act shall be borne by Purchaser.

(Doc. no. 108, Ex. 12 at 8.) This clause sets forth how the parties' costs and fees would be allocated "[i]n the event a definitive Asset Sale Agreement is not executed."[18] If Plaintiffs considered the ASA to be a legally binding contract on December 22, 2005, and believed that neither party could legally walk away from the transaction, presumably there would have been no reason for Plaintiffs to insist on a provision allocating the parties' expenses in the event the ASA was not executed.[19]

In their briefs, Plaintiffs correctly summarize Georgia law by stating that "[a]ssent to the terms of a contract may be given other than by signatures" and that "[t]he circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement." Terry Hunt Constr. Co. v. AON Risk Serv., Inc., 272 Ga. App. 547, 552 (2005). However, unlike the cases cited by

---

[18] It is worth noting again that the unambiguous language here speaks in terms of allocating costs in the event the ASA is not *executed*, and not in the event the proposed transaction is not *consummated*.

[19] Like the exclusivity provision, Plaintiffs have difficulty explaining why their legal counsel insisted that this allocation of costs provision be inserted into the LOI. Ascension's General Counsel testified that the clause was only meant to speak in terms of how the parties would bear the costs in the event the federal government blocked the transaction under the anti-trust scrutiny of the Hart-Scott-Rodino Act. (Impicciche Dep. at 113-14; 116-17.) Ascension's CFO and chief negotiator testified that he did not recall having any discussions about this paragraph. (Speranzo Dep. at 120-21.)

Plaintiffs, there is no evidence here of oral representations or actual performance under the terms of an agreement evidencing an intent to be bound despite the absence of the parties' signatures. See E. Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 670 F. Supp. 947, 952 (S.D. Fla. 1987) (finding evidence of intent to be bound where, among other things "[i]t [was] also undisputed that the parties acted on and operated under the Agreement"); McDavid, 303 Ga. App. at 594, 598 (concluding parties intended to be bound where defendant manifested intent to be bound through repeated oral statements to plaintiff that "[y]ou're our guy;" confirming that "the deal is done;" and formal announcement that "we have a deal"); Bd. of Regents of The Univ. Sys. of Ga. v. Doe, 278 Ga. App. 878 (2006) (finding intent to be bound where defendant publicly introduced plaintiff as the new dean on several occasions and plaintiff began actively working on behalf of the university). The present case is further distinguishable from this line of cases in that the evidence before the Court includes a letter of intent, executed a month after Plaintiffs allege the contract was formed, which irrefutably evidences no intent to be bound.

Plaintiffs attempt to liken this case to the above-referenced cases by citing Defendant's ambiguous statements to third parties and actions in anticipation of the proposed transaction; however, Plaintiffs' evidence falls short of demonstrating Defendant's intent to be bound by the unsigned ASA. Plaintiffs claim Defendant's press releases and SEC filings demonstrate that

Defendant considered the ASA a final, binding agreement. These public statements consistently communicate, in a general sense, that Defendant had negotiated the terms of an ASA that was yet to be executed and that Defendant intended for the acquisition to be completed. These references, however, are, at best, ambiguous with respect to the existence of a binding contract; they do not establish Defendant's understanding that they were under a binding obligation to purchase the Hospital by the terms of an already existing binding contract.

Plaintiffs also rely on Defendant's transitional activities performed in preparation for the proposed transaction to show that a binding agreement existed for the purchase of the Hospital. These activities were meant to enable a smooth transition of ownership and operation in the event the transaction was completed. The evidence shows that these activities were customary, many of the activities were taken at Defendant's own risk and expense, and these activities would have to be reversed in cases where the proposed transaction fails. (Owings Dep. at 45, 109; Bell Dep. at 183-84.) Importantly, there is no evidence and no claim that Defendant began to operate or control the Hospital.[20]

---

[20] The Court acknowledges that, in addition to Defendant's press releases, SEC filings, and transitional activities, Plaintiffs point to statements of Defendant's representatives looking ahead to the public hearing and to a completed transaction, as well as portions of the AG Notice and Hart-Scott-Rodino filing in an attempt to show the parties' intent to be bound. These forward-looking statements, however, likewise do not speak to the present existence of a binding contract. Consistent with Plaintiffs' other evidence, the statements merely demonstrate that the parties had negotiated the terms of an ASA and the parties' hope that the proposed transaction would be completed. The Court specifically notes that an informal email from Vincent Cherry—the individual tapped by HMA to be CEO of St. Joseph if the transaction were consummated—stating that "[o]ur company did not buy the hospital to see the volumes drop" does not demonstrate the existence of a binding contract. (Doc. no. 108, Ex. 8

The facts here are more similar to those presented to the Eleventh Circuit in Doll. The parties in that case "set forth the terms of an acceptable lease" in a letter, but noted that no binding agreement had yet been reached. Put otherwise, even though the letter set forth details of their agreement, they never manifested an intent to be bound by that agreement. 925 F.2d at 1367-69. The Doll court held as follows with respect to these facts:

> [U]nless the parties intended to be bound by the statements they made during these negotiations, they did not enter into a contract to sign a lease. Every possible provision of a contemplated lease may be discussed and agreed upon, but unless the parties intend that these discussions be binding, no contract has been formed. When the parties express their intention to be bound and they specify the basic terms of the lease, the courts will enforce the contract, and thus the lease, to avoid frustrating the parties' original intent. When such indications of intent are absent or are explicitly disavowed, however, the justification for enforcing the proposed lease is wholly absent.

Id. at 1370; see also Dumas v. First Fed. Sav. & Loan Ass'n, 654 F.2d 359, 361 (5th Cir. 1981)[21] (applying Georgia law) (affirming determination that, as a matter of law, letter agreement providing details about proposed sale but expressly contingent upon a mutually acceptable purchase and sale agreement was not enforceable because "parties did not intend the letter agreement to be a binding, enforceable contract"). Here too, the evidence shows that the parties extensively negotiated the provisions of the unsigned

at 21.) Cherry was not involved in the negotiation process and was not familiar with the details or the status of the proposed acquisition. (Cherry Dep. at 34-35.)

[21] Decisions of the Court of Appeals for the Fifth Circuit that were announced prior to October 1, 1981, are binding precedent in the Eleventh Circuit. See Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

ASA, but the LOI also objectively shows they intended not to be bound by it.

The Court "will even enforce an unexecuted agreement if it appears the parties have expressed their assent. In such a situation, the [C]ourt is merely enforcing what the evidence suggests was the intent of the parties." Doll, 925 F.2d at 1370. Nevertheless, when, as here, "the parties make their intentions clear, there is no basis for [the Court] to step in and contradict their explicit desires." Id.; see also Dumas, 654 F.2d at 361 (concluding defendant did not expect it would be bound by the terms in letter agreement in light of language conditioning final agreement on the execution of a mutually acceptable contract); Overton Apparel, Inc. v. Russell Corp., 264 Ga. App. 306, 308-09 (2003) (affirming decision granting summary judgment on breach of contract claim because no binding contract existed where evidence showed parties only reached non-binding letter of intent); Hartrampf, 157 Ga. App. at 881 ("Where it is evident from a written instrument, that the parties contemplated that [the agreement] was incomplete, and that a binding agreement would be made subsequently, there is no agreement.").

In conclusion, the Court finds that no reasonable juror could find that a binding contract existed in December of 2005, as Plaintiffs allege, when the subsequently executed LOI, an unenforceable agreement to agree, irrefutably shows the parties understood that a binding agreement had not arisen. See Dumas, 654

23

F.2d at 361 ("Admittedly, Georgia courts ofttimes consider matters of intent to be questions for the fact finder. Nevertheless, where the language of a writing is clear and definite, a court can, as a matter of law, ascertain the plain intentions of the parties as expressed in the wording of the [letter] agreement.") (internal quotations and citations omitted).

For the foregoing reasons, Defendant's motion for summary judgment on Plaintiffs' breach of contract claim is **GRANTED**.[22]

### B. Promissory Estoppel

#### 1. *Applicable Law*

To prevail on a promissory estoppel claim, a plaintiff must show that (1) the defendant made certain promises; (2) the defendant should have expected that plaintiff would rely on such promises; (3) the plaintiff did in fact rely on such promises to his detriment; and (4) injustice can be avoided only by enforcement of the promise because the plaintiff surrendered or rendered a valuable right. Everts v. Century Supply Corp., 264 Ga. App. 218, 220 (2003); see also O.C.G.A. § 13-3-44(a) ("A promise which the promisor should reasonably expect to induce action or forbearance

---

[22] Accordingly, Plaintiffs' motion for summary judgment on the issues of whether a binding contract was formed and whether a binding contract was breached is **DENIED**. Plaintiffs' motion for summary judgment on the validity of Defendant's statute of frauds defense is **DENIED AS MOOT**.

To the extent Plaintiffs meant for their equitable estoppel claim to apply to Defendant's argument that the parties never assented to a binding contract, the Court finds that this claim is without merit. Estoppels are not favored, and as made clear by the Court's above analysis, the evidence does not support the essential elements of equitable estoppel. There is no evidence of intended deception or gross negligence on the part of Defendant which would amount to a constructive fraud or any reliance thereupon by Plaintiffs. See Horne v. Exum, 204 Ga. App. 337, 338 (1992) (setting forth essential elements of equitable estoppel); see also O.C.G.A. § 24-4-27.

on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."). Further, "[p]romissory estoppel cannot be applied unless the promisee reasonably relied on the promise." Fidelity & Deposit Land Co. of Md. V. W. Point Constr. Co., 178 Ga. App. 578, 580 (1986). Notably, "promissory estoppel claims are extremely fact-specific and are not susceptible to the application of generalized rules." Doll, 925 F.3d at 1372.

2. *Analysis*

Plaintiffs assert that "HMA promised to purchase the assets of St. Joseph Hospital and reasonably expected to and did induce [Plaintiffs] to rely on its promise." (Compl. ¶ 36.) More specifically, Plaintiffs allege that they "reasonably relied on HMA's repeated promises and public statements that HMA agreed to purchase the Assets of St. Joseph," and "injustice may be avoided only by enforcing the promise made . . . by HMA to purchase" the Hospital. (Id. ¶¶ 37, 40.)

In Doll, after initially concluding that the parties had not entered into a binding agreement, the Eleventh Circuit addressed the plaintiffs' promissory estoppel claim. The court held that the plaintiffs were unable to satisfy the reasonable reliance prong of their promissory estoppel claim because documents from the negotiation process "clearly articulated [the defendant's] desire not to be bound until the final draft of the lease was executed." Doll, 925 F.2d at 1371. The court rejected the plaintiffs' claim

that the defendant's repeated expressions of interest in executing a lease constituted a promise upon which the plaintiffs reasonably relied. The court held, instead, as a matter of law, that the plaintiffs' reliance was unreasonable given the statements in the exchanged written documents that the agreement was "subject to the resolution of a mutually agreeable lease document and its execution by both [Plaintiffs] and [defendant]." Id. at 1365-69. The court explained:

> In this case there is simply no basis for the contention that the partners' reliance was reasonable. To hold otherwise would render potential tenants like [defendant] incapable of protecting themselves against liability during the course of negotiations. It is difficult to imagine what else [defendant] could have done to pursue the project in this case while simultaneously avoiding being bound until a lease was signed. To allow a promissory estoppel claim to proceed in this context would be to allow equity to denigrate a term expressly bargained for between the parties.

Id. at 1373.

In the case at bar, Defendant may have promised that it was interested in acquiring the Hospital, that it planned to pursue negotiations, and that it had every intention of finalizing and executing the ASA. See id. at 1373. Plaintiffs, however, cannot point to a single instance in which Defendant promised to consummate the sale of the Hospital. See Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 265 (2d. Cir. 1984) (affirming court's decision to reject promissory estoppel claim where parties had negotiated sixteen drafts of an agreement, resolved all open issues, and reached an agreement in principle, because the

plaintiffs could not point to a promise to consummate deal nor show that their reliance on any promise was reasonable where parties made clear that their obligations were "contingent upon execution and delivery of the formal contract document").

Moreover, as explained in Doll, even if the evidence showed that a promise sufficient to support a promissory estoppel claim had been made, the express language that appears in the LOI is fatal to Plaintiffs' claim of reasonable reliance. The LOI clearly reflects the parties' intentions not to be bound until a definitive and binding ASA was finalized and executed.[23] To allow Plaintiffs to circumvent this unequivocal language—that directly emerged from negotiations between two sophisticated parties represented by counsel—through promissory estoppel would run contrary to the Eleventh Circuit's opinion in Doll. 925 F.2d at 1373 ("To allow a promissory estoppel claim to proceed in this context would be to allow equity to denigrate a term expressly bargained for between the parties.").

Apart from the LOI, and contrary to Plaintiffs' characterization, Defendant's public statements and filings were conditional and conveyed an intent to only become bound once a definitive ASA was finalized and executed. For example, Defendant's press releases regarding the negotiation process each explained that execution of a definitive purchase agreement was

---

[23] The LOI explains that the parties' intent was to finalize and execute a binding agreement only after the Attorney General review process. There is evidence to suggest that the parties anticipated some resistance from competing hospitals and others at the public hearing and that receiving Attorney General approval was not a foregone conclusion. (See, e.g., Bell Dep. at 69-70.)

subject to Attorney General review and approval pursuant to Georgia law. Likewise, the Hart-Scott-Rodino filing read as follows: "This transaction is conditioned upon, among other things: (1) the execution of a definitive agreement . . . [and] (3) the receipt of all required governmental authorizations from all applicable government entities." (Doc. no. 108, Ex. 16 at 6.) Furthermore, there is direct evidence suggesting that Plaintiffs understood that the parties would not be bound by the ASA until they signed it.[24] Defendant consistently made clear that, despite its interest in completing the acquisition, and despite its pursuit of the acquisition with genuine enthusiasm, it had no intention of becoming obligated until a definitive, binding agreement was executed. Plaintiffs' reliance on Defendant's statements of intent was unreasonable in light of their conditional nature.

Lastly, even assuming Plaintiffs could demonstrate that Defendant promised to consummate the acquisition of the Hospital and that they reasonably relied on that promise, Plaintiffs' promissory estoppel claim would still fail. Promissory estoppel is "an equitable doctrine designed to prevent the intricacies and details of the law *from frustrating the ends of justice.*" Doll, 925 F.2d at 1373 (emphasis added). Simply put, promissory estoppel would only be appropriate "*if injustice [could] be avoided only by*

---

[24] For example, the "Pre-Closing Checklist" prepared by Plaintiffs' counsel in January of 2006 includes a list of "Items to be Done Prior to Closing," which indicates that the ASA still needed "[t]o be executed and delivered after favorable report received from Attorney General." (Doc. no. 103, Ex. 30 at 2.)

28

*enforcement of the promise."* O.C.G.A. § 13-3-44(a) (emphasis added).

The parties in this litigation are sophisticated corporate entities that were represented by equally sophisticated counsel when they engaged in tough, arms-length and informed negotiations. "Therefore, it cannot be reasonably maintained that they did not comprehend the letter of intent that they signed or that they did not understand the possibility that the transaction would not be completed." W.R. Grace & Co. v. Taco Tico Acquisition Corp., 216 Ga. App. 423, 424 (1995). Plaintiffs cannot now "avoid the responsibility for [their] actions taken in preparation for the acquisition of [St. Joseph] based on their assumption that the transaction would be completed." Id.

It is in the interest of justice that parties, especially sophisticated corporate entities working towards a large-scale, complex acquisition, be permitted to negotiate without fearing judicial intervention forcing them into an agreement they do not want. "If any sign of agreement on any issue exposed the parties to a risk that a judge would deem the first-resolved items to be stand-alone contracts, the process of negotiation would be more cumbersome (the parties would have to hedge every sentence with cautionary legalese), and these extra negotiating costs would raise the effective price." PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc., 420 F.3d 728, 731 (7th Cir. 2005). This is not a case in which injustice can only be avoided through promissory estoppel.

Upon the foregoing, Defendant's motion for summary judgment on Plaintiffs' promissory estoppel claim is **GRANTED**.

### C. Breach of Duties of Good Faith and Cooperation

Plaintiffs allege that Defendant breached an independent obligation to cooperate in good faith to consummate the transaction and Plaintiffs were damaged as a result. (Compl. ¶¶ 25-28.) Plaintiffs specifically argue that the express terms of the ASA obligated Defendant to use reasonable commercial efforts to satisfy all conditions—to the extent that it could control or influence the satisfaction of such conditions—including obtaining all required governmental authorizations. According to Plaintiffs, by unilaterally refusing to complete the Attorney General review process, Defendant breached this express, independent contractual obligation. Plaintiffs also argue that Defendant breached a promise contained in the LOI which required Defendant to cooperate in good faith to complete the Attorney General review process. Plaintiffs rely on one of the few binding provisions in the LOI:

> [Plaintiffs] and [Defendant] agree to cooperate with each other concerning the Sale Transaction: (i) in the preparation and submittal of any filings required pursuant to the Georgia Hospital Acquisition Act and (ii) during the course of any public hearings which take place pursuant to the Georgia Hospital Acquisition Act.

(Doc. no. 108, Ex. 12 at 8.) Plaintiffs assert that Defendant breached this contractual obligation when it withdrew from the proposed transaction.

30

Defendant argues that it is entitled to summary judgment on this claim for two reasons. First, Defendant contends that any duty to act in good faith to consummate the transaction that allegedly stems from the ASA is of no effect because the ASA was not a binding contract. Second, Defendant argues that any duty to cooperate based upon the LOI should not be interpreted as a duty to finalize and execute the ASA.

As to this claim, the Court is largely in agreement with Defendant. With regard to Plaintiffs' initial argument, the Court finds that because the ASA was not a binding contract, no express duty contained therein applies. Moreover, no implied duty of good faith and fair dealing arose in connection with the ASA. See Onbrand Media v. Codex Consulting, 301 Ga. App. 141, 147 (2009) (concluding that no independent claim outside of breach of contract exists for a claim based upon an implied contractual duty of good faith and fair dealing).

Regarding the promise to cooperate contained in the LOI, there does not appear to be any evidence that Defendant breached it. There is nothing to suggest that Defendant was uncooperative in the preparation or submittal of any filing under the Georgia Hospital Acquisition Act. Similarly, the undisputed evidence shows that Defendant withdrew its non-binding offer with respect to the proposed transaction prior to the scheduled Attorney General hearing. That is, no public hearing ever took place pursuant to the Act. The clause at issue states that the parties "agree to

31

cooperate with each other . . . during the course of any public hearings *which take place* pursuant to the Georgia Hospital Acquisition Act." (Doc. no. 108, Ex. 12 at 8 (emphasis added).)

Importantly, the promise to cooperate during the Attorney General review process cannot now be transformed by the Court into a duty to complete the transaction. As argued by Defendant, this cooperation provision only applied to the extent the parties continued working toward completing the proposed transaction. The clause does not create a duty to complete the transaction, and the remainder of the LOI expressly contemplates the parties' right not to do so. Furthermore, in light of the Court's conclusion that Defendant was not under a binding obligation to purchase the Hospital, it would be unreasonable to require the parties to complete the Attorney General review process after Defendant withdrew its non-binding offer.

In any event, it is unclear whether a claim arising from a duty to cooperate clause in a letter of intent could support an independent cause of action under Georgia law. The provision at issue appears to be most similar to provisions creating a duty to "negotiate in good faith" or negotiate with "best efforts," which are frequently included in letters of intent. Many courts employ the "traditional view" and are unwilling to enforce promises to negotiate in "good faith" or with "best efforts" in letters of intent or agreements in principle when they have concluded that there was no binding contract to consummate the underlying

transaction. See, e.g., C&S Acquisitions Corp. v. Nw. Aircraft, Inc., 153 F.3d 622, 626 (8th Cir. 1998) ("Under Minnesota law, agreements to negotiate in good faith are unenforceable as a matter of law."); Beazer Homes Corp. v. VMIF/Anden Southbridge Venture, 235 F. Supp. 2d 485, 492 (E.D. Va. 2002) (holding that under Virginia law agreement to "negotiate in good faith in a timely manner a Subcontract Agreement" was unenforceable agreement to agree); King v. Nev. Elec. Inv. Co., 893 F. Supp. 1006, 1020 (D. Utah 1994) (finding agreement to "negotiate in good faith to conclude" an agreement unenforceable as matter of law); Kopperl v. Bain, No. 3:09-CV-1754, 2010 WL 3490980, at *6-*7 (D. Conn. Aug. 30, 2010) (concluding that cause of action for a breach of duty to negotiate in good faith does not appear to exist under Connecticut law); Cinelli v. Ward, 997 S.W.2d 474, 478 (Ky. Ct. App. 1998) (analyzing promise to negotiate with "best efforts" and concluding that "[w]e seem to take the traditional 'all or nothing' approach: Either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less").

A federal court's proper role in a diversity case is to "rule upon state law as it exists and [] not surmise or suggest its expansion." Burris Chem., Inc. v. USX Corp., 10 F.3d 243, 247 (4th Cir. 1993). Federal courts must "apply state law" and decline invitations to "participate in an effort to change it." Id.

It is unclear whether Georgia courts would allow an independent claim based on an alleged breach of a letter of intent's promise to cooperate or whether this promise would be considered a part of the unenforceable agreement to agree.[25] In the absence of a showing that an independent claim for breach of a duty to cooperate in a letter of intent could be supported under Georgia law, the Court is unwilling to find in favor of Plaintiffs on this issue.

For the foregoing reasons, Defendant's motion for summary judgment on Plaintiffs' claim that Defendant breached its duties to cooperate in good faith to ensure consummation of the transaction is hereby **GRANTED**.

### D. Breach of the Confidentiality Agreement

Plaintiffs allege that Defendant breached the parties' confidentiality agreement. (Compl. ¶¶ 33-34.) Specifically, Plaintiffs assert that Defendant breached the confidentiality agreement by sending an email to the Attorney General's office explaining that it was withdrawing from the proposed transaction because the Hospital had "experienced significant deterioration in its operating performance including adverse changes in physician

---

[25] It appears that Georgia courts are more than likely unwilling to enforce a duty to cooperate or negotiate in good faith where there is no binding contract as to the underlying transaction. In Miami Heights LT, LLC v. Home Depot U.S.A., Inc., the plaintiff contended that the defendant breached its contractual obligation to negotiate in good faith where the letter of intent expressly stated: "[t]he parties agree to negotiate in good faith to finalize the Agreement." 283 Ga. App. 779, 780-82, 782 n.5 (2007). The Georgia court did not explicitly address whether an independent claim could exist based on a promise to negotiate in good faith; however, the trial court and appellate court apparently rejected plaintiff's breach of contract claim because the letter of intent, as a whole, was merely an unenforceable agreement to agree.

referral practices since the submission of the notice to [the Attorney General's] office." (Doc. no. 108, Ex. 8 at 4.) Defendant argues that it did not violate the confidentiality agreement because the contents of its email were already in the public domain as a result of Plaintiffs' own actions and because the communication was authorized as a "necessary notification" to a government authority.

The confidentiality agreement was intended to prohibit Defendant from disclosing confidential or proprietary information acquired from Plaintiffs during the due diligence and negotiation process. Pursuant to this legal document, Defendant agreed to "not disclose Confidential Information to third-parties, in whole or in part, without the express written consent of Ascension or St. Joseph;" "to reveal Confidential Information only to its officers, directors, agents, representatives, and employees who need to know the Confidential Information for the purpose of performing the services herein described;" to notify Plaintiffs if it received a request to disclose information regarding a possible transaction; to "not make any public comment regarding the terms of this possible Transaction or the discussions among the Parties regarding any possible transaction;" and to make no "actual or implicit disparagement or denigration of any of the other Parties." (Doc. no. 108, Ex. 3 at 26-28.) Notably, the agreement expressly provides that "Confidential Information shall not include information that (i) is in the public domain by publication or

otherwise through no act or omission of [Defendant]." (Id. at 27.)
Subsequently, pursuant to the LOI, the parties agreed that the
confidentiality agreement continued to govern their actions except
with regard to the making of all "necessary filings and/or
notifications, if any, with all governmental agencies or
authorities which [were] required to be made, including, without
limitation, pursuant to the Georgia Hospital Acquisition Act . . .
in order for [Defendant] to acquire the assets as described in the
Asset Sale Agreement." (Doc. no. 108, Ex. 12 at 8.)

Plaintiffs contend that, on its face, Defendant's email to the
Attorney General breached the confidentiality agreement. Defendant
responds by arguing that it did not disclose anything about
Plaintiffs' financial condition and operational difficulties that
Plaintiffs had not already disclosed through their public AG Notice
submission.[26] Defendant argues that its email did not communicate
"Confidential Information" as defined by the agreement; according
to Defendant, the information conveyed was already "in the public
domain by publication or otherwise through no act or omission of
[Defendant]." Defendant asserts that, at most, its email revealed
that Plaintiffs' previously disclosed financial problems were
continuing. Plaintiffs, however, contend the email did far more
than this; they assert that the email inappropriately summarizes
information acquired by Defendant after the submission of AG Notice

_____

[26] The previously filed AG Notice explained that Plaintiffs were searching for a
viable way to allow them to strengthen the Hospital's financial condition and enhance
the services it provided, that the Hospital was facing "serious financial issues,
increasing operational difficulties, and problems unique to its market which has
several competing hospitals," and that "[c]losure of the Hospital as the only
alternative [to selling] was strongly considered." (Doc. no. 108, Ex. 3 at 10.)

36

and, more importantly, states that the Hospital's financial condition and operations had deteriorated after the AG Notice.[27]

Defendant next argues that Plaintiffs' claim for breach of the confidentiality agreement must fail because their correspondence to the Attorney General's office was authorized by the LOI as a "necessary filing/or notification" pursuant to the Georgia Hospital Acquisition Act. Defendant claims the communication informing the Attorney General of the withdrawal was a necessary notification. Plaintiffs respond that the email was neither necessary nor designed to assist in completing the Attorney General review process and that it was merely designed to justify Defendant's withdrawal from the transaction. Plaintiffs further respond that, even if Defendant was required to notify the Attorney General, Defendant's email conveyed significantly more information than necessary, including disparaging details.[28]

Plaintiffs have presented sufficient facts to create a jury issue with respect to whether Defendant's email to the Attorney General's office breached the confidentiality agreement. Specifically, questions remain as to whether Defendant's email communicated "Confidential Information" as defined by the confidentiality agreement and whether Defendant's email was exempt from the agreement as a "necessary notification" to a government

---

[27] Plaintiffs rely on the fact that Defendant's email explicitly states that the Hospital had "experienced deterioration in its operating performance and adverse changes in physician referral practices *since* the submission of the notice to your office." (Doc. no. 108, Ex. 8 at 4 (emphasis added).)

[28] Defendant contends that if it stated only that it was withdrawing, without more, the Attorney General's office would have questioned Defendant about its reasons, necessitating the disclosure of an explanation.

authority. Defendant has not demonstrated that it is entitled, as a matter of law, to a finding that it did not breach the confidentiality agreement.

For the foregoing reasons, Defendant's motion for summary judgment on Plaintiffs' claim for breach of the confidentiality agreement is **DENIED**.

### E. Attorneys' Fees

Plaintiffs claim that they are entitled to recover attorneys' fees pursuant to O.C.G.A. § 13-6-11 because Defendant's "breaches of its agreement, duty to act in good faith, and promise to purchase [the Hospital] were in bad faith," and because Defendant has caused "unnecessary trouble and expense by virtue of its breaches and Plaintiffs' subsequent efforts to mitigate its damages." (Compl. ¶¶ 43-44.)

A claim for attorneys' fees under O.C.G.A. § 13-6-11 may not be recovered when the plaintiff is not entitled to an award of general damages. Dowdell v. Krystal Co., 291 Ga. App. 469, 473 (2008). Further, where there is no evidence of bad faith or stubborn litigiousness, the court should grant a defendant's motion for summary judgment on the claim for attorneys' fees. Garret v. Women's Health Care of Gwinett, P.C., 243 Ga. App. 53, 55 (2000). Here, Plaintiffs have failed to demonstrate that genuine issues of material fact exist with respect to Defendant's alleged breach of a contract to purchase the Hospital; there is likewise no evidence

that Defendant acted in bad faith, was stubbornly litigious, or caused Plaintiffs unnecessary trouble and expense.

Upon the foregoing, Defendant's motion for summary judgment on Plaintiffs' claim for attorneys' fees is **GRANTED**.

## IV. CONCLUSION

Based upon the foregoing, Defendant's Motion for Summary Judgment (doc. no. 101) is hereby **GRANTED IN PART AND DENIED IN PART**, to the extent set forth in this Order. Correspondingly, Plaintiffs' Motion for Partial Summary Judgment (doc. no. 106) is **DENIED**. As a result of the decisions set forth in this Order, the pending motions for hearing of oral argument (doc. nos. 105 & 112) are **DENIED AS MOOT**.

**ORDER ENTERED** at Augusta, Georgia, this 30th day of March, 2011.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA